**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **CALVIN WATTS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:13-cv-742-MHT-PWG** |
| ) | |
| **CITY OF OPELIKA,** ) | |
| **ALABAMA,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## ORDER AND REPORT AND RECOMMENDATION

On October 9, 2013, Plaintiff Calvin Watts filed this lawsuit against the City of Opelika, Alabama, Joshua Combs, and Thomas Mangham seeking redress for injuries he allegedly sustained during an arrest in October 2011 through claims sounding in federal and Alabama state law.  Generally, Watts alleges that Defendant Joshua Combs, who at the time of Plaintiff's arrest was a police officer employed by the City of Opelika, used unconstitutionally excessive force during the arrest. Defendant Mangham was the Chief of Police for the City of Opelika.  This matter is before the court on the following: (1) a motion for summary judgment filed by Defendant Mangham (Doc. 22); (2) a motion for summary judgment filed by Defendants City of Opelika and Joshua Combs (Doc. 24); and (3) a motion to strike

1

portions of Plaintiff's affidavit in opposition to the motions for summary judgment filed by the City of Opelika and Officer Combs (Doc. 31).

In his Complaint, Plaintiff asserts the following causes of action: (1) a claim against all Defendants, asserted through the remedial vehicle of 42 U.S.C. § 1983, for violations of Plaintiff's rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution (Counts I & III); (2) § 1983 municipal policy or custom claims against the City of Opelika and Defendant Mangham (Counts II & IV); (3) a claim for "false arrest" against all Defendants (Count V); (4) state law claims for negligence and wantonness against Defendant Combs (Count VI) and, pursuant to Ala. Code § 11-47-190, against the City of Opelika (Count VII); (5) state law claims for negligent and wanton hiring, training, and supervision against the City of Opelika (Count VIII) and Defendant Mangham (Count IX); and (6) state law claims for assault and battery against Defendant Combs (Count X).

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, and the court may exercise supplemental jurisdiction over Plaintiff's state law claims in accordance with 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391. On November 20, 2014, this matter was referred to the undersigned by U.S. District Judge Myron H. Thompson for disposition or recommendation on all

pretrial matters.  (Doc. 34).  *See also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

In response to the motions for summary judgment, Plaintiff abandoned his claims against Defendant Mangham (Doc. 29) as well as his Fourteenth Amendment claims, his § 1983 municipal liability claims, the false arrest claims, and the state law claims for negligence, wantonness, and negligent and wanton hiring, training and supervision against the City of Opelika and Defendant Combs.  (Doc. 28).  As such, summary judgment is properly granted as to all claims against Defendant Mangham and the City of Opelika.[1]

---

[1] Plaintiff does not oppose summary judgment on his claims against the City of Opelika with the one exception that he "does not abdicate [his] claim against the City of Opelika for its liability for the acts of Combs under Ala. Code § 11-47-190 as set out in Count VII of the complaint."  (Doc. 28 at p. 19).  "Section 11-47-190 codifies the doctrine of respondeat superior, such that the City may be liable only if its employee is liable." *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1315 (S.D. Ala. 2001).  Plaintiff abandoned or conceded that summary judgment is proper as to all negligence based or wantonness claims against Combs.  Count VII of Plaintiff's Complaint, in which he asserts his claim under § 11-47-190, expressly limits the scope of the claim to negligence or wanton conduct by Combs; however, when opposing summary judgment, Plaintiff suggests that Count VII provides blanket coverage for all underlying torts by Combs, including intentional torts.  That expansion of Count VII is likely because the only remaining state law claims against Officer Combs are the intentional torts of assault and battery. A plaintiff cannot recast or expand his claims when opposing summary judgment, and he is limited to the assertions of his complaint.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  That said, the result is identical whether Count VII is read to include a reference to intentional torts or not.  As a matter of law, "[a] municipality cannot be held liable for the intentional torts of its employees."  *Cremeens v. City of Montgomery*, 779 So. 2d 1190, 1201 (Ala. 2000) (citing Ala. Code § 11-47-190; *Gore v. City of Hoover*, 559 So.2d 163 (Ala.1990)).  Accordingly, summary judgment is proper in favor of the City of Opelika as to

3

The only claims remaining to be adjudicated are Plaintiff's § 1983 Fourth Amendment excessive force claim and the state law claims for assault and battery against Defendant Combs, and summary judgment is due to be denied as to those claims.

## I.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.   Once the moving party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

---

Plaintiff's claim under Ala. Code § 11-47-190.

4

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). When opposing a motion for summary judgment, however, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d 1023. If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

"Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003).

## II.   EVIDENTIARY ISSUES

In opposition to Defendants' motions for summary judgment, Plaintiff tenders

an affidavit offering his testimony that he does not read "well" and speaking to the circumstances and the extent of his injuries sustained during the arrest at issue in this lawsuit.  (Doc. 28-3).  Defendants City of Opelika and Combs move to strike the Plaintiff's affidavit testimony that:

> "I do not read well, and I did not attempt to read the Plea Bargain Agreement or any of the documents Ms. Brown[2] had me sign ..."; and

> "I was not given the opportunity to see these forms - including the Plea Bargain Agreement - prior to going into the adjoining room with my attorney."

(Doc. 31 at p. 1 (quoting Calvin Watts' Affidavit at Doc. 28-3)).  The movants argue that the affidavit testimony contradicts Plaintiff's statements at his plea colloquy before the municipal court, the testimony is impermissibly "self serving," and Plaintiff is perpetrating a "sham."

Plaintiff testified at his change of plea hearing that he reads "some."  That is the same testimony he gave in his deposition in this case.  There is no obvious difference between the testimony that Plaintiff reads "some" and that he does not read "well," and the movants do not explain the distinction.  (Doc. 24-5 at p. 6; Doc. 28-3).  Plaintiff was not asked at the change of plea hearing whether he read the plea agreement form, as the movants argue in the motion to strike.  Rather, the exchange

---

[2] Brown was Plaintiff's attorney during the criminal proceedings.

between Watts and the municipal court presents a nuance that is clarified by Plaintiff's affidavit.  After Plaintiff testified that he could read and write the English language "some," and without any explanation beyond that description of his ability to read, the municipal judge asked, "Have you had an opportunity, given your ability such that it is to read and write [the] English language, have you had an opportunity to read that form?"  (Doc. 24-5 at p. 6).  Mr. Watts responded, "Yes, sir."  In light of the municipal court's qualified question, it is possible that Mr. Watts did not read the form at all and that his response to the question as it was posed is not untrue.  Plaintiff's affidavit is not in obvious conflict with prior sworn testimony such that it is due to be stricken as a "sham."  If the movants believe Watts' testimony is inconsistent, they can attempt to prove the inconsistency at trial.

The motion also seeks to have the following affidavit testimony stricken from the record:

> On October 9, 2011, I fled from police on foot.  When Officer Joshua Combs caught up with me, he tackled me.  I landed face down on the ground with my arms pinned underneath me.  Officer Combs climbed on top of me and I could not move.  Several other officers arrived immediately after I went to the ground, and grabbed me along with Officer Combs.  I never resisted Officer Combs once he got on top of me.  He hit me in the face and ribs after he got on top of me causing a fracture of the orbital bone in my face, a broken nose, and broken ribs.

(Doc. 28-3 at pp. 1-2).  The movants argue that Mr. Watts is not qualified to testify

7

about the cause and extent of his injuries because of his lack of medical expertise and "the totality of his version of what occurred." (Doc. 31 at pp. 2-3). Specifically, Defendants contend that Plaintiff's affidavit is not based on personal knowledge and fails to meet the requirement for expert testimony required by Federal Rule of Evidence 702.

The notion that Plaintiff lacks personal knowledge to testify about the events incident to his arrest is frivolous. Insofar as Defendants argue that Plaintiff's affidavit testimony is unreliable, that challenges weight and credibility, not Plaintiff's personal knowledge of the events surrounding his arrest.

Defendants' claim that Plaintiff is not a medical expert is accurate to the extent that Plaintiff is not qualified to offer expert testimony, and Plaintiff agrees that the testimony "is not an attempt at extracting expert medical testimony." (Doc. 33 at p. 4). An individual who is not a medical expert can testify as a fact witness about his personal knowledge of information in his medical records and medical conditions that were diagnosed by a physician. Plaintiff is not testifying that he diagnosed the extent of his injuries. There are undisputed medical records before the court that corroborate Plaintiff's testimony regarding his injuries. Practically, with regard to the motions for summary judgment, Defendants have not offered evidence that contradicts the undisputed evidence in Plaintiff's affidavit and medical records about the extent of

his injuries. Even if Plaintiff's affidavit testimony about the diagnosis of his injuries was stricken, Plaintiff's unrebutted medical records remain before the court.

The motion to strike is due to be denied.

## III.   BACKGROUND AND FACTS[3]

On October 9, 2011, Plaintiff was driving in Opelika, Alabama, in a blue Ford sedan. (Doc. 23-1 at p. 12). Unfortunately for Plaintiff, he resembles an individual, Ronald Fitch, who is known to Opelika police. Officer Phillip Hancock observed Plaintiff exit a parking lot. (Doc. 24-3 at p. 4). Hancock mistook Plaintiff for Mr. Fitch, who Hancock knew "to have a revoked driver's license." (Doc. 24-3 at p. 4). According to Hancock, Plaintiff "observed" him and his patrol car before merging into traffic. (Doc. 24-3 at p. 4). Because of heavy traffic, Officer Hancock was unable to give chase; however, he notified police dispatch by radio, and Officer Combs responded to Hancock's call for assistance.

After receiving Hancock's notification, Combs saw Plaintiff's blue Ford behind his patrol car. (Doc. 24-1 at p. 5). Combs pressed his brakes and waited for the Ford to pass, but Plaintiff "immediately made an illegal right turn" by failing to signal.

---

[3] These are the facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted). All disputes of fact based on evidence of record, not a party's unsupported allegations, are construed in a light most favorable to Plaintiff, the non-movant.

(*Id.*).  Combs was able to pursue Plaintiff's vehicle, he engaged his emergency equipment and "attempted to perform a traffic stop."  (*Id.*).  Plaintiff saw the police car behind him with lights flashing,[4] he knew he should have pulled over and stopped, but he did not because he was frightened.  (Doc. 23-1 at p. 13).  Plaintiff "panicked" because he had marijuana seeds and drug paraphernalia in his car.  (Doc. 23-1 at p. 13).  Instead of pulling over, Plaintiff "just kept going," and he led Officer Combs and other police officers on what Combs described as a "high speed," "Hot Pursuit" car chase.  (Doc. 24-1 at p. 5; Doc. 24-3 at p. 4).  During the chase, Plaintiff "drove the vehicle into oncoming traffic nearly striking other cars in traffic on several occasions."  (Doc. 24-1 at p. 5).

The road chase ended after Plaintiff mistakenly turned down a dead end street.  (Docs. 23-1, 24-1 at p. 5, 24-3 at p. 4).  When he came to the end of the road, and with the police directly behind, Plaintiff abandoned his car and ran into some woods at the end of the street.  Officer Combs saw Plaintiff throw away "unknown items as he ran into the woods."  Plaintiff testified during his deposition that he discarded only his hat.  (Docs. 23-1 at p. 14, 24-1 at p. 5).  Officer Combs pursued Plaintiff on foot, tackled Plaintiff from behind, and took him to the ground approximately fifteen or

---

[4] There is some dispute as to whether Officer Combs also had his siren on, but that dispute is immaterial to the instant motions.  The parties agree that Officer Combs attempted to pull Plaintiff over, Plaintiff knew that was the case, and he opted to flee.

twenty feet from where they started running.  (Doc. 23-1 at p. 14; Doc. 24-1).  It is at this point in the narrative that the parties present differing accounts of what transpired.

Plaintiff testified that he was tackled in a clearing, with no trees or bushes within reach.  Presumably because none were around, Plaintiff did not make contact with any bushes or trees when Combs tackled him.  (Doc. 23-1 at p. 14).  Plaintiff was not injured during his run through the woods; specifically, Plaintiff testified that he did not scratch his body or eyes on bushes while he ran.  (Doc. 23-1 at p. 14). Plaintiff testified he did not injure his face when he was tackled.  (Doc. 23-1 at p. 15). When Combs tackled Plaintiff, Watts was on his stomach with his arms pinned underneath his body.  Watts could neither "move" nor "turn over."  (Doc. 23-1 at p. 15).  Plaintiff testified that he immediately stopped resisting or attempting to flee as soon as he was tackled to the ground and that he was completely in Combs' control. Plaintiff could not fight against Combs because he was face down with his arms restrained by the weight of his and Officer Combs' bodies, and Watts did not kick or flail his arms after he was tackled.  (Doc. 23-1 at p. 18-19).

While Combs was straddling Plaintiff's back, and as Plaintiff's arms and hands were secured underneath his body, Combs turned Plaintiff's head to one side.  (Doc. 23-1 at p. 15-16).  Combs, using his fists and elbows, then proceeded to strike

11

Plaintiff about the face.  (Doc. 23-1 at p. 15-16).  At the same time, Combs also "kicked" Plaintiff in the sides using his knees.  Other officers joined Combs and "kicked" and "stomped down" on Plaintiff's arms, torso, and legs. (Doc. 23-1 at p. 16).  Plaintiff does not know how many other officers kicked or stomped him, but he felt at least one other person kicking him.  (Doc. 23-1 at p. 19).

Combs did not turn Plaintiff over onto his back, and Plaintiff remained on his stomach until he was picked up by police officers and handcuffed.  When the officers led Plaintiff out of the wooded area, he was bleeding from his nose, eye and face and he was choking on sand.  (Doc. 23-1 at p. 17).

The officers searched Plaintiff's car, and they found marijuana seeds on the dashboard as well as other drug paraphernalia.  (Doc. 23-1 at p. 19).  Officer Combs testified that he also found a burnt brillo pad "with residue" and a small piece of copper pipe that he deduced was used to "smoke crack."  (Doc. 24-1 at p. 6).  However, there is no evidence of record that crack residue was found on those items, and Plaintiff was not charged with any drug offenses specific to crack cocaine.  Plaintiff testified that he does not use cocaine,[5] but he does use marijuana.  (Doc. 23-

---

[5] Officer Hancock testifies, in an exhibit to his affidavit, that Plaintiff admitted to using crack cocaine on the day of the chase.  (Doc. 24-3 at p. 4).  There is no additional evidence to corroborate Hancock's testimony, and Plaintiff's testimony that he denies using cocaine is sufficient on summary judgment for a viewing of this fact in his favor.

1).

Despite the fact that Plaintiff's injuries were extensive, the arresting officers transported Plaintiff directly to a police station and not a hospital.  While Plaintiff was at the Opelika police station, a narcotics investigator came to interview him, believing that he was Mr. Fitch.  Once the investigator determined Plaintiff was not Fitch, he ended the conversation.  Only then did the police contact the paramedics, who assessed Plaintiff's condition and recommended that he be taken to the hospital by ambulance for emergency treatment of his injuries, particularly Plaintiff's broken ribs.  (Doc. 23-1 at p. 20).  Combs would not permit Plaintiff to be taken by ambulance, and he told the paramedics that he would transport Plaintiff to the hospital. Officer Hancock later drove Plaintiff to an emergency room, where Plaintiff received medical treatment and was released into police custody.  (Doc. 24-3 at p. 4).

Plaintiff was taken from the emergency room to a county jail, where he was examined by a nurse.  (Doc. 23-1 at p. 21).  The nurse diagnosed Plaintiff with broken ribs and told him he would be taken to see a "special doctor."  (Doc. 23-1 at p. 21). Plaintiff was put into a cell, and officers took him to a hospital the following day.  A doctor scheduled Plaintiff for surgery on October 11 — two days after his arrest — to repair damage resulting from his injuries sustained during the arrest.  (Doc. 23-1 at p. 22).  After leaving the hospital on October 10, Plaintiff was returned to jail, he

13

posted bond, and he was released.

Plaintiff's medical records indicate that he suffered a broken jaw, which included fractures to his "right orbit, zygoma, and maxilla," and that the injury was the result of an assault. (Doc. 28-2). According to medical records, Plaintiff underwent surgery to install a metal plate to repair a "fracture of the right zygomaticomaxillary complex." (Doc. 28-2). The metal plate in Plaintiff's jaw is permanent. Plaintiff also suffered broken ribs, a broken nose, and an eye injury. Plaintiff's broken nose was "set" while Plaintiff was unconscious during his jaw surgery. (Doc. 23-1 at p. 22). Plaintiff's jaw and eye injury continue to give him "trouble"; his eye waters constantly and impairs his vision. (Doc. 23-1 at p. 24).

Officer Combs offers evidence of a different story. According to Officer Combs, he tackled Plaintiff "forcing him into a tree and to the ground." (Doc. 24-1 at p. 6). Combs asserts that

> Watts rolled over on his back and began bicycle kicking me toward my chest and face. Watts was reaching into his pockets trying to retrieve unknown items. I struck Watts in the perennial nerve in his leg several times in order to keep him from kicking me. Watts turned over on his stomach while continuing to retrieve an unknown object from his pockets. I was able to get on top of Watts, but was unable to force his arms from underneath him. I screamed at Watts repeatedly to stop resisting and give me his hands. Watts refused, and began elbowing me with his right elbow. I pushed my weight into him to try to force Watts into the ground and struck him several times about his body to force compliance while trying to secure his arm with my left hand. Watts

14

refused to comply and just fought harder, trying to lift me off of him pulling his arm underneath him tighter and elbow me. Officer Hancock arrived to assist me. Officer Hancock got on top of Watts on the right side. Watts continued to flail about, trying to get away from police. Hancock gave Watts a knee strike to the right side of the body in order to force pain compliance. Watts got his left hand from underneath him and tried to throw a small pill white pill bottle.[6] I yelled "Crack bottle" and was able to pin his left arm to the ground. I placed Watts in a wrist lock and forced his hand behind his back. Hancock secured Watts['] right hand and pulled it behind his back while straddling Watts to keep him pinned to the ground.

(Doc. 24-1 at pp. 5-6).

Officer Hancock's recollection of the events is similar to Officer Combs' testimony. Once Plaintiff fled on foot, Hancock

exited my patrol car and pursued on foot behind Officer Combs. As I entered the wood line Officer Combs was struggling with the suspect on the ground. Officer Combs was trying to gain control and I gave [Watts] a knee strike to the right side of his body. The suspect still refused to place his hands behind his back, so I struck him again with my knee. Officer Combs began to yell "He has crack!" at which time I observed a white pill bottle in [Watts'] left hand. The suspect was attempting to throw the bottle, so I pushed his face into the ground so he could not see. I then reached across his body and I secured his hand. Officer Combs was able to gain control of his other hand at which time we rolled the suspect over and placed him into handcuffs.

(Doc. 24-3 at p. 4). Despite the evidence that Hancock was present at the time Plaintiff was injured and that he struck Plaintiff with his knee, Plaintiff did not seek

---

[6] Watts testified that he had "love pills" for erectile dysfunction in his possession at the time of his arrest. He denies throwing them from his person during his arrest. (Doc. 23-1).

to amend his Complaint to add Hancock as a named defendant. The period allotted for amending the pleadings has expired, and Hancock is not a party to this lawsuit.

After his arrest, Plaintiff was charged with five misdemeanor offenses, including possession of drug paraphernalia, possession of marijuana in the second degree, reckless endangerment, attempting to elude or flee, and resisting arrest. (Doc. 23-2). A trial was held in municipal court, and Plaintiff was found guilty on all charges. (Doc. 23-1 at p. 28). There is nothing of record speaking to what sentence Plaintiff received or would have received after his conviction. He appealed the guilty verdict to the Circuit Court of Lee County, Alabama. (Doc. 23-1 at p. 28). While his appeal was pending, Plaintiff entered into a plea agreement. (Doc. 23-1 at pp. 28-29; Doc. 23-2; Doc. 24-5). He pled guilty to all charges. (*Id.*). A judge held a change of plea hearing in municipal court on September 13, 2012. (*Id.*).

At the hearing, Plaintiff was represented by an attorney who previously represented him in a defense against criminal charges in the early-1990's. Plaintiff testified that he was satisfied with his attorney's services. While the extent of Plaintiff's ability to read and write is unclear on the record, all testimony of record indicates that he has some difficulty reading.[7] (Doc. 23-1; Doc. 24-5; Doc. 28-3).

---

[7] As discussed *supra*, Plaintiff testified during his deposition and at the plea colloquy that he reads "some." (Doc. 23-1; Doc. 24-5). In his affidavit, Plaintiff states that he does not "read well." (Doc. 28-3).

16

With regard to the plea agreement form Plaintiff was required to sign, the municipal court and Plaintiff had the following exchange:

THE COURT:      All right.  Well, let me show you this Explanation of Rights and Plea of Guilty Form.  Were the rights and matters set forth on that form read to you by your attorney?

WATTS:          Yes, sir.

THE COURT:      Were they explained to you by your attorney?

WATTS:          Yes, sir.

THE COURT:      Okay.  Are you able to read and write the English language?

WATTS:          Some, yes.

THE COURT:      Okay. Well, now, let me ask you this.  Have you had an opportunity, given your ability such that it is to read and write the English language, have you had an opportunity to read that form?

WATTS:          Yes, sir.

THE COURT:      All right.  Now, and [your attorney] has also read it to you, correct?

WATTS:          Yes, sir.

THE COURT:      All right.  And has she – have you given her and has she been given a chance to explain everything to you?

WATTS:          Yes, sir.

THE COURT:      All right.  Are you confident that between what you have

read and what Ms. Brown has read and explained that you understand the rights on that form?

WATTS:               Yes, sir.

(Doc. 24-5 at pp. 5-7).  Watts also testified at the hearing that his signature was on the form.  (Doc. 24-5 at p. 7; *see also* Doc. 23-2).  The court accepted Plaintiff's change of plea, entered pleas of guilty, and sentenced Plaintiff to six months in jail and assessed various monetary fines.  (Doc. 23-2).  Plaintiff was released from jail on March 12, 2013.  (Doc. 23-1 at p. 29).

At issue in this case is release language appearing on the plea agreement form Plaintiff signed.  The "Plea Bargain / Agreement and Order" signed by Plaintiff and entered by the municipal court reads, in relevant part, "[Watts], in return for this agreement, waives and releases [the] City [of Opelika] and all its employees / agents / representatives / officers and attorneys from any and all claims he/she might have against them as a result of any acts or omissions occurring prior to signing."  (Doc. 23-2).  A typographic "X" appears before that statement and above Plaintiff's signature.  (Doc. 23-2).  During the plea colloquy, the municipal court did not specifically discuss the release provision; however, the court discussed nearly every other aspect of the plea agreement form in detail.  (Doc. 24-5 at pp. 2-24).  Plaintiff testified, through his affidavit, that he relied on his attorney to explain the form, he

did not read the form before the plea colloquy, and his attorney did not "say anything about my civil claims or how my plea might affect [sic] them."  (Doc. 28-3 at p. 1). According to Plaintiff's affidavit, "[s]he never mentioned my civil claims or my lawsuit at all."  (*Id.*).

Nearly seven months after he completed his sentence, Plaintiff filed this lawsuit.

## IV.   DISCUSSION

### A.   Defendants' Proffered "Release-Dismissal Agreement"

All Defendants' primary argument in support of summary judgment is that Plaintiff entered into what Defendants construe as a "release-dismissal agreement" as part of his plea agreement whereby Plaintiff agreed to waive and release the claims asserted in this lawsuit.  In a plurality decision, the Supreme Court held that release-dismissal agreements are not *per se* invalid, but the Court cautioned that such agreements should be closely scrutinized on a "case by case" basis.  *See Town of Newton v. Rumery*, 480 U.S. 386 (1987)  As previously noted in this case, "Where there is a release-dismissal agreement at issue on summary judgment, a court should address the question of release before turning to other issues as a release is dispositive of all claims and defenses.  *See Penn v. City of Montgomery, Alabama*, 273 F.Supp.2d 1229 (M.D. Ala. 2003)[, *aff'd Penn v. City of Montgomery, Alabama*, 381 F.3d 1059

(11th Cir. 2004)]; *Jimenez v. Brunner*, 328 F.Supp.2d 1208 (D. Utah 2004)." (Doc. 36 at p. 2 n.1).

The court does not accept the parties' assumption that the language in the plea agreement is, in fact, a release-dismissal agreement.  In accordance with Federal Rule of Civil Procedure 56(f)(2 & 3), the court directed the parties to file additional briefing on this issue, observing that:

> Plaintiff denies that he knowingly and voluntarily entered into an agreement to release the civil claims that form the basis of this lawsuit.
>
> Based on a review of the legal authority cited by the parties on the release issue and other release-dismissal cases not relied upon in the parties' papers, release-dismissal agreements are seemingly a contract in which an individual who is or imminently will be charged with a crime enters into an agreement with the government whereby all criminal charges against the individual are dismissed and the individual, in turn, releases the government and its employees or agencies from civil liability.  *See* [*Penn*, *supra*]; *Jimenez v. Brunner*, 328 F.Supp.2d 1208 (D. Utah 2004) (considering a release-dismissal agreement under *Rumery* that was entered into as a result of a plea in abeyance); *Gorman v. Wood*, 663 So.2d 921 (Ala. 1995) (applying *Rumery* where all charges were dismissed and holding that a release-dismissal was valid because it was entered into voluntarily and there was no evidence of fraud).  The Supreme Court held in *Rumery* that release-dismissal agreements are not *per se* impermissible, but that they should be judged on a case-by-case basis. *Rumery*, 480 U.S. at 392.
>
> As with any affirmative defense, the party asserting the applicability of a release agreement bears the burden of proof.  *See* Fed. R. Civ. P. 12(c).  That is equally true with release-dismissal agreements, and the party seeking to enforce such an agreement bears the burden of proof. *Penn*, 273 F.Supp.2d at 1235-36 (citing *Rumery*, 480 U.S. at 399-

402 (O'Connor, J. concurring)).

While the parties proceed as though the proffered release agreement is, in fact, a release-dismissal agreement, that mixed question of fact and law is not established.  In the release-dismissal agreement cases cited by the parties, an individual traded the right to pursue civil claims for a dismissal of criminal charges. Those individuals did not enter guilty pleas, with the exception of a plea in abeyance, nor did they serve a term of confinement after the release-dismissal agreement was reached.  In the present case, it is undisputed that Plaintiff pled guilty to several criminal offenses in municipal court, the charges were never dismissed as with a plea in abeyance, and Plaintiff was confined to jail for a term of approximately six months as a result of his guilty pleas. The "dismissal" aspect of the "release-dismissal" agreement in this case is noticeably lacking.

What is unclear on the record and from the parties' briefs is what effect, if any, the disposition of Plaintiff's criminal charges has on this court's analysis of the release-dismissal agreement issue on summary judgment.  Stated differently: Is the "agreement" at issue in this litigation a "release-dismissal agreement" at all?  Defendants bear the burden of proof to answer that question.  *See Penn*, *supra*.

\* \* \*

The undisputed facts that the criminal charges pending against Plaintiff were not dismissed when he entered into a plea agreement and that Plaintiff served a period of confinement are seemingly material to the question of whether Plaintiff entered into a *Rumery* "release-dismissal" agreement.  Consistent with the notice requirement imposed on the court by Rule 56(f), the parties are cautioned that summary judgment may be recommended or decided on the basis that the "release-dismissal" agreement at issue in this litigation is not of the sort discussed in *Rumery* or its progeny such that those cases are not analogous to the circumstances of this action.  Moreover, if Defendants satisfy their burden of proof to demonstrate that the release language at issue here is a *Rumery* release-dismissal agreement, Defendants must also show that

they have met their burden of proof on each of the *Penn* elements necessary to sustain a valid release-dismissal agreement. *See Rumery & Penn*, *supra*. As expressed in Justice O'Connor's concurring opinion in *Rumery* and followed in *Penn*, absence of evidence will not suffice to meet the burden of proof. *See id*.

(Doc. 36 at pp. 2-5). Notably, the Eleventh Circuit has not examined release-dismissal agreements in a published decision. There is no binding precedent in the Eleventh Circuit related to release-dismissal agreements in general, and there is nothing as to the specific issue before this court — whether a release-dismissal agreement document can be valid in the absence of a dismissal of criminal charges.

Defendants' supplemental brief directed the court to cases involving criminal charges that were not dismissed but a release was entered into ancillary to a plea agreement, and those decisions applied the law regarding release-dismissal agreements to find enforceable releases of § 1983 claims. However, those cases do not stand for the proposition that the "dismissal" aspect can be absent and nonetheless result in a true "release-dismissal agreement."[8] *See Burke v. Johnson*, 167 F.3d 276 (6th Cir. 1999); *Davis v. Ort*, 42 F.Supp.2d 465 (D. N.J. 1999). Defendants also assert that the Eleventh Circuit has never rejected the use or propriety of release-

---

[8] While acknowledging that the case is "not factually on point," Defendants also cite *Berry v. Peterson*, 887 F.2d 635 (5th Cir. 1989). *Berry* discusses *Rumery*, but it is dissimilar to the instant case to such a significant degree that it is not persuasive authority and is not discussed herein.

dismissal agreements in cases where criminal charges are not dismissed; however, that assertion ignores that the issue has never been considered in the Eleventh Circuit. The absence of an Eleventh Circuit decision on point does not give rise to binding or even persuasive authority for any point of law, and it does not suggest how the Eleventh Circuit would rule on an issue.

The Sixth Circuit's decision in *Burke*, while informative on the general law of release-dismissal agreements, is not persuasive regarding the question of whether the language in the written plea agreement form at issue is properly characterized as a release-dismissal agreement in light of Plaintiff's conviction and imprisonment. In *Burke*, an individual who was not a stranger to criminal proceedings, pled guilty to reduced felony charges in exchange for the dismissal with prejudice of other pending, related felony charges. 167 F.3d 276. As part of the plea agreement, Burke entered into an "oral agreement" in open court to release "the officers associated with the circumstances" of his arrest as well as the township in which he was arrested from all civil claims Burke could bring "in consideration of the State giving up the important count of felonious assault of a police officer," among other concessions by the State. *Burke*, 167 F.3d at 278. Six months later, Burke filed a § 1983 action based on actions of the officers and township incident to his arrest. *Id.* at 279. The Sixth Circuit affirmed the district court's decision to dismiss all claims in the § 1983 action

23

because Burke entered into a release-dismissal agreement.   The Court in *Burke* accepted that the oral agreement was an enforceable release, and it held that the *Rumery* factors weighed against Burke's position that the agreement was not entered into voluntarily.   *Id.*   However, the Sixth Circuit did not consider whether the agreement should be construed as a release-dismissal agreement despite that there was no dismissal of criminal charges, but it proceeded under that assumption that *Rumery* applied without discussion.   In other words, the question posed by this court as to whether there actually is a release-dismissal agreement in this case because the "dismissal" portion of the agreement is lacking was not addressed in *Burke*, and it does not appear to have been raised by any party to that proceeding or by the Court *sua sponte*.   Without an explanation in *Burke* for the Court's basis for construing the oral promise as a true release-dismissal agreement, that decision does not provide persuasive guidance.

The New Jersey district court's decision in *Davis*, *supra*, while being more on point to the question presented in this case, does not afford Defendants the persuasive authority they seek to support their proposition that the body of case law on release-dismissal agreements should be applied to the release language here.   Davis was charged with multiple misdemeanors and entered into a plea agreement in a city court. In exchange for a reduction in the charges, an imposition of a fine, participation in an

Alcoholics Anonymous program and a suspended five day jail sentence,[9] Davis pled guilty to a charge of driving while intoxicated and creating a public disturbance. *Davis*, 42 F.Supp.2d at 469. Davis also agreed to execute a release of any civil claims arising from his arrest. *Id.* Nevertheless, Davis filed a lawsuit, which was dismissed because of the release.

In its written decision enforcing the release agreement, the district court stated that, "The principal question ... is whether a release agreement is enforceable when a defendant in a municipal court proceeding waives his right to pursue a civil rights action in exchange for pleading guilty to less serious municipal charges." *Davis*, 42 F.Supp.2d at 471. The court in *Davis* determined that it was not presented with a release dismissal agreement because the charges against Davis were not, in fact, dismissed. *Id.* Nevertheless, the court concluded that "considering the similarities between release-dismissal agreements and the agreement in question — in terms of legal issues raised and the public interests at stake — the Court finds that case law concerning release-dismissal agreements applies to this case." *Id.* One case has followed the *Davis* court's reasoning on this point, without additional analysis: *Williams v. Dellorco*, No. 05-4129 (RBK), 2007 WL 4171653, at *4 (D. N.J. Nov. 20,

---

[9] One fact that distinguishes *Davis* from Watts' situation is that Davis was not deprived of his liberty as a result of entering into a plea agreement and a release.

2007) (following *Davis* and finding that "releases procured by a reduction in charges" should be analyzed under case law regarding release-dismissal agreements).

What is missing from Defendants' briefs as well as from *Davis* and *Williams* is an explanation — beyond a cursory statement that legal issues and public interests are similar in both instances — as to why the release-dismissal body of case law should be expanded to apply to other release agreements entered into ancillary to a plea agreement when there is not a dismissal of criminal charges. Release-dismissal agreements are unique. *See Rumery*, *supra*. They are aptly named. If one strips away the "dismissal" aspect, all that is left is a "release." If that is so, there is no evident reason to apply or extract meaning from case law on release-dismissal agreements. The plurality decision and Justice O'Connor's concurrence in *Rumery*, and that case's progeny, take care to define the parameters of release-dismissal agreements, and one does not exist without both a release and a dismissal.

Because Defendants' arguments in support of the affirmative defense of release rest exclusively on the premise that Plaintiff entered into a release-dismissal agreement or, alternatively, that the body of law regarding release-dismissal agreements applies to the release language in this case, summary judgment is not appropriate. The court will not speculate as to whether the language releases Defendants from liability under an alternative theory that has not been advanced or

briefed.

However, assuming *arguendo* that the agreement is properly considered under release-dismissal case law, Defendant is nonetheless not entitled to summary judgment. For a release-dismissal agreement to be enforceable, the party seeking the benefits of the agreement must show that "(1) it was voluntary; (2) there was no evidence of prosecutorial misconduct; and (3) enforcement of the agreement would not adversely affect the relevant public interests." *Penn v. City of Montgomery, Alabama*, 273 F. Supp. 2d 1229, 1236 (M.D. Ala. 2003), *aff'd Penn v. City of Montgomery*, 381 F.3d 1059 (11th Cir. 2004). *See also Libmen v. City of Avondale Estates*, 190 F. App'x 774, 776 (11th Cir. 2006) ("A release-dismissal agreement will be enforced if the party seeking enforcement can show (1) that it was entered into voluntarily; (2) that there is no evidence of prosecutorial misconduct; and (3) that the enforcement of the release is in the public interest."). Defendants bear the burden of proving each of those elements; absence of evidence on one point of consideration does not weigh in favor of a finding that the point is established. *Cf. Rumery*, 480 U.S. at 401 (a party moving to enforce a release-dismissal agreement must "*prove*" the elements necessary and "courts should not presume" the elements are satisfied) (O'Connor concurring) (emphasis in original); *Burke*, 167 F.3d at 281 ("[t]he burden of proving each of [the *Rumery* elements] falls upon the party in the § 1983 action

who seeks to invoke the agreement as a defense.") (citation omitted); *Penn*, *supra* (finding that there was no evidence that the prosecutor acted inappropriately and finding that element satisfied).

In *Rumery*, the Court found the release-dismissal agreement was voluntary because Rumery was a knowledgeable and experienced businessman, he was advised by an experienced criminal defense attorney, Rumery's attorney drafted the release dismissal agreement, Rumery discussed the agreement with his attorney prior to signing, Rumery considered the agreement for three days before signing, and he was not in custody at the time he agreed to the release. *Burke*, 167 F.3d at 281 (discussing *Rumery*); *see also Penn*, *supra*.

Watts has a ninth grade education. (Doc. 24-5 at p. 5). He testified that he reads "some" or that he does not read "well," and that he relied on his attorney to read the plea agreement form to him. While there is no question that Mr. Watts' criminal attorney is experienced and that he was pleased with her services, she did not draft the release agreement. Watts does not recall discussing the release aspect of his plea agreement with his attorney, the municipal court did not discuss the release language during the plea hearing, and Watts had less than one day to consider the plea agreement before his plea colloquy. Watts was not in custody at the time he entered his plea agreement; however, he faced six months in jail under the plea agreement and

28

up to a year in jail if he did not change his plea and his conviction was upheld on appeal. On balance, viewing the facts in a light most favorable to Watts on summary judgment, Defendants have not met their burden to prove voluntariness, and the agreement is not enforceable. At a minimum, there are disputes of material fact regarding voluntariness that render summary disposition inappropriate.

There is no evidence of prosecutorial misconduct. Plaintiff entered into the plea agreement after he had been convicted of the charges pending against him, and that conviction was on appeal. This not a situation wherein a prosecutor concocted criminal charges to gain leverage against allegations of police conduct. A finding that there was not prosecutorial misconduct is proper "where the parties present advancing conflicting versions of the facts giving rise to a Section 1983 litigant's alleged injuries[.]" *Burke*, 167 F.3d at 282. Such is the case here.

As to the final factor — that enforcement of this release would not adversely impact public interests — Defendants cite to cases that found the release agreements before those courts served public concerns. *See Libman* and *Penn*, *supra*. Defendants, however, do not discuss how those findings are applicable to the release agreement and the circumstances presented in this case. As such, the argument is underdeveloped and is not considered. Defendants have failed to show the final *Rumery* factor.

Because Defendants have not met their burden of proof on two of the three *Rumery* considerations, summary judgment is due to be denied even assuming that the release language is properly treated as a release-dismissal agreement.[10]

## B.    Qualified Immunity

Defendant Combs asserts that he is entitled to qualified immunity. Interestingly, Combs makes this assertion while also conceding that "Watts categorically denies doing anything that constituted resisting arrest once he was on the ground. This denial means that any physical handling of him was unwarranted and illegal." (Doc. 25 at p. 24). This is a correct statement of the law as applied to the facts when they are construed in a light most favorable to Watts; however, the

---

[10] Defendants argue that the language in Plaintiff's plea agreement form, which they contend is a release-dismissal agreement, should be analyzed outside of the *Rumery* factors with regard to Plaintiff's state law claims. (Doc. 25). Stated differently, Defendants contend that *Rumery* applies to only federal claims but not to state law claims; however, there is no indication in *Rumery* to support such a reading. Defendants' assertion is also contrary to law. The Alabama Supreme Court, in the only case on point identified by the parties, analyzed a release-dismissal agreement under the factors discussed in *Rumery*. *See Gorman v. Wood*, 663 So.2d 921 (Ala. 1995) (acknowledging *Rumery* and finding a release-dismissal agreement enforceable). As such, the discussion herein applies to Plaintiff's federal and state law claims. If one ignores *Gorman* and assuming, *arguendo*, that Defendants are correct and that the release language at issue and its impact on Plaintiff's state law claims should be considered under the body of Alabama case law with respect to releases in general, summary judgment is due to be denied. A release is only enforceable if it is "supported by valuable consideration[.]" *Wayne J. Griffin Elec., Inc. v. Dunn Const. Co.*, 622 So.2d 314, 317 (Ala. 1993). Defendants have not argued that there is "valuable consideration" for this agreement, and the court finds none.

As the proffered release does not meet the basic criteria for a valid release agreement under Alabama law, the court does not reach the merits of Plaintiff's argument that the release agreement is voidable because it is unconscionable.

concession effectively defeats Combs' entitlement to qualified immunity on summary judgment for the reasons discussed below.

Qualified immunity offers complete protection for a government official—provided that the official was performing discretionary functions and has been sued in his individual capacity—if the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The Supreme Court has held that the doctrine of "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects public officials from broad-ranging discovery disruptive to effective government, *id*. at 818, and operates as a shield against civil damages due to mistaken judgments. *Malley v. Briggs*, 475 U.S. 335, 343 (1986); *see also Butz v. Economou*, 438 U.S. 478, 507 (1978) ("[Public] officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law."). The qualified immunity entitlement will fail only "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow*, 457 U.S. at 815

31

(quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)) (emphasis removed).

Qualified immunity "represents the norm" for government officials exercising discretionary authority. *Id.* at 807. Indeed, as the qualified immunity defense has evolved, it provides ample protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.  The qualified immunity analysis utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless [his] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). "We generally accord ... official conduct a presumption of legitimacy." *United States  Department of State v. Ray,* 502 U.S. 164, 179 (1991).

Defendants retain their entitlement to qualified immunity if a reasonable police officer, in light of the information known to them along with pre-existing law, could have believed his conduct lawful. *See Creighton*, 483 U.S. at 641. The outcome of an assertion of qualified immunity depends in large measure on whether (1) the law allegedly violated was clearly established at the time of the conduct complained about, and (2) if it was, whether the official's conduct was objectively reasonable in light of the information known to the official at the time.  *See id.*  Those are objective

and fact-specific inquiries, and while the court addresses them as questions of law, *Mitchell*, 472 U.S. at 526-28 & n. 9, it does so by viewing the record through the eyes of an objective, reasonable governmental official. *See Nicholson v. Georgia Department of Human Resources*, 918 F.2d 145, 147 (11th Cir. 1990). To determine whether an officer's actions were objectively reasonable, the court looks at the information known to him, viewed in a light most favorable to the plaintiff. *See Swint v. City of Wadley*, 5 F.3d 1435, 1438 (11th Cir. 1993), *modified on reh'g on other grounds*, 11 F.3d 1030 (11th Cir. 1994).

Under qualified immunity, an officer is protected from suit when he makes a reasonable mistake of law or fact. *See Pearson*, 555 U.S. at 231. *See also Messerschmidt v. Millender*, --- U.S. ----, 132 S.Ct. 1235, 1244 (2012) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks and citations omitted). If an officer's error is entitled to the protection of qualified immunity, such protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (internal quotation marks and citations omitted). Indeed, as the Eleventh Circuit has stated, "the salient question...is whether the state of the law [at the time of the events in question] gave

33

respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Once a defendant has raised qualified immunity and has shown that his actions were within the scope of discretionary authority, then the plaintiff has the burden to overcome the defense. *See Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). More specifically, the Eleventh Circuit recognizes a two-part analysis for qualified immunity claims. First the defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Cottone v. Jenne*, 326 F.3d 1352, 1357-58 (11th Cir. 2003). Second, once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions violated a clearly established constitutional right. *See Hope v. Pelzer*, 536 U.S. 730, 736 (2002). Furthermore, there is a temporal requirement related to this inquiry—a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *Creighton*, 483 U.S. at 641; *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

As discussed *supra*, the qualified immunity analysis utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless [his] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Invs., Inc.*, 132 F.3d at 1366. "We generally accord ... official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991). Defendants retain their entitlement to qualified immunity if a reasonable police officer, in light of the information known to them along with pre-existing law, could have believed his conduct lawful.

As set out above, a number of factors are employed by courts to test the constitutionality of the conduct of police officers during the course of an arrest. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." *Graham*, 490 U.S. at 95.  "[A]pplication [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  The excessive force standard "looks

to the need for force, the amount of force used, and the injury inflicted." *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997).   An organizing principle of Fourth Amendment excessive force jurisprudence is that a police officer is authorized to use some measure of force to affect an arrest. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396; *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003); *Nolin v. Isbell*, 207 F.3d 1253, 1258 n. 4 (11th Cir. 2000).

Prior to *Graham*, there was a convergence of opinion that, in the Fourth Amendment context, a factor to be considered was whether the force, whatever the level of severity, was used in good faith and not for malicious or sadistic reasons. In *Leslie v. Ingram* 786 F.2d 1533, 1536 (11th Cir. 1986), the appeals court established a four-part test for evaluating an excessive force claim which included the "good faith" element.[11]   This is to say that the intention or motive of the officer was relevant to the inquiry. The *Graham* decision appears to have directly overruled the use of this factor. 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth

---

[11]   "[U]nder this circuit's test for evaluating an excessive force claim the court must examine: (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Byrd v. Clark*, 783 F.2d 1002, 1006, (11th Cir. 1986); *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1501 (11th Cir. 1985) (*en banc*).

Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").[12]

Applying the *Leslie* factors, it is clear that Watts was arrested for minor, misdemeanor infractions, he did not resist arrest once he was tackled to the ground nor did he pose a danger to Officer Combs or anyone else.  It is also clear that no force was required to arrest Watts after he had been tackled. All of the events at issue took place after he had been restrained with his hands secured under his body. No force at all was necessary to bring Mr. Watts into the custody of Officer Combs once Watts was tackled to the ground.

It was clearly established by October 9, 2011, that using force on a subdued individual who is no longer resisting arrest, attempting to flee, or poses no threat to the arresting officers violates the Fourth Amendment.  *See Hadley v. Gutierrez*, 526 F.3d 1324, 1333-34 (11th Cir. 2008) (explaining that the Eleventh Circuit held that, by 1998, "our precedent clearly established that government officials may not use gratuitous force against a prisoner who has already been subdued" and extending that holding to a "handcuffed, non-resisting" defendant) (citations omitted)).  The bright

---

[12] The motive of a corrections officer or jailer in cases involving excessive force unquestionably remained relevant in the custodial context under the Eighth Amendment. *See Whitney v. Albers*, 475 U.S. 312, 321 (1986).

line principle that no force is permissible once an individual no longer is fleeing or poses a threat to police officers should have been known to Officer Combs at the time of Plaintiff's arrest.  Accepting Plaintiff's version of events as true, the force used by Combs was excessive.

Separate from the "clearly established" analysis, if Plaintiff's version of events is taken as fact, this case fits within the "narrow exception to the rule requiring particularized case law to establish clearly the law in excessive force cases." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000).  "When an excessive force plaintiff shows that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw, the official is not entitled to the defense of qualified immunity." *Id.* (citation and marks omitted). "To come within the narrow exception, a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Id.* (citations and marks omitted).  "[P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances for qualified immunity to be unavailable to

a defendant. *Id.* at 927 (citation and marks omitted).

Once Combs tackled Plaintiff, whose arms were pinned between his body and the ground, Combs turned Plaintiff's head to the side and proceeded to strike Plaintiff in the head with is fists and elbows and kicked Plaintiff's ribs with his knees. Combs held Plaintiff to the ground while at least one other police officer, Officer Hancock, also struck Plaintiff. The beating Plaintiff received by the officers resulted in substantial and permanent injuries. Any police officer should have known that such conduct violates the Fourth Amendment, even assuming that no previous case law found a violation under similar circumstances.

## 1.   *De Minimus* Force

Officer Combs correctly observes that there is considerable authority for the proposition that, when the force used in affecting an arrest is later determined to have been unnecessary, the officer is not liable for damages if the injuries are minor. This rule simply recognizes the fact that, because some force is sometimes needed to make an arrest, an officer will not be held to answer when he errs in the need for force but does not cause significant injury. *See*, *e.g.*, *Nolin*, 207 F.3d at 1257 ([T]his circuit has established to principle that the application of *de minimus* force, *without more*, will not support a claim for excessive force in violation of the Fourth Amendment.) (emphasis supplied). It is also true that, when force is required, the use of reasonable

force which causes significant injury does subject an officer to liability.  The *de minimus* injury inquiry does not authorize the court to engage in an "injury comparison" exercise to determine whether an unnecessary use of force caused injuries not greater than those resulting from the necessary use of force required in affecting an arrest.  This "injury comparison" notion is of no relevance to the assessment of constitutional conduct by an officer using force when none is required against a restrained, unresisting citizen.  *See Hadley*, 526 F.3d at 1330, 1332 (holding that a police officer who struck a handcuffed, non-resisting suspect in the stomach violated the Fourth Amendment and was not entitled to qualified immunity).  In the present case, while Watts was not handcuffed, he was nevertheless restrained and subdued.

The principle of finding force to be *de minimus* in the absence of significant injury

> has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat. Indeed, [the Eleventh Circuit] recognized the principle in *Slicker*, 215 F.3d at 1233, and *Lee*, 284 F.3d at 1197, and yet in both cases we held that there was a Fourth Amendment violation based on the use of gratuitous force on a handcuffed and compliant suspect, and that the officers in question were not entitled to qualified immunity.

*Saunders v. Duke* 766 F.3d 2014, 1262 (11th Cir. 2014) (citing *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000); *Lee*, 284 F.3d at 1198.

The gratuitous use of force on a subdued suspect does not permit a finding of qualified immunity "merely because [an arrestee] has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38-39 (2010) (Eighth Amendment analysis cited and applied in *Saunders*, 766 F.3d at 1270 ("We see no reason the same rationale should not apply in a Fourth Amendment excessive force case.")). *See also Jackson v. Lee*, 2014 WL 4829552 at n. 8 (S.D. Ala. Sep. 29, 2014) ("Had the plaintiff not been resisting, qualified immunity presumably would be denied, since '[o]ur cases hold that gratuitous force when a criminal suspect is not resisting arrest constitutes excessive force.'") (citing *Hadley*, 526 F.3d at 1330); *Brown v. Sheriff of Orange County, Florida*, 2014 WL 2722350 (M.D. Fla. June 16, 2014).

The parties disagree on the central fact issue of whether Officer Combs used force on Watts as he fought against Combs' attempts to subdue Watts or if, after Watts was subdued, Combs beat and kicked Watts, causing serious and permanent injuries. If the latter action occurred, it was gratuitous and "unnecessary to any legitimate law enforcement purpose." *Slicker* 215 F.3d at 1233. Upon the facts as pled and those disputed on the evidence, Officer Combs is not shielded by qualified immunity because any reasonable officer would have known that to commit the acts

41

alleged and evidenced by Watts' testimony violated clearly established law.[13]

### C.  *Heck v. Humphrey* **and Collateral Estoppel**[14]

Combs argues that Plaintiff's Fourth Amendment excessive force claim fails

based on *Heck v. Humphrey*, 512 U.S. 744, 114 S.Ct. 2364 (1994), wherein the

Supreme Court held that a § 1983 claim for a constitutional violation will not lie

where the civil claim "would render a conviction or sentence invalid."  512 U.S. at

486-87.  Combs' argument on this point is misguided.  He premises his *Heck*

assertion on a misstatement of the facts: that Watts was not resisting arrest until

Combs tackled him to the ground.  According to Combs' construction of the facts,

Watts was not resisting arrest at any point during the high speed car chase or when

Watts fled on foot into the woods with Officers Combs and Hancock close on his

heels.  In support of this telling of events, Combs discusses facts not in evidence;

specifically, the indictment charging Plaintiff with the criminal charge of resisting

arrest.  In essence, there is not evidence to support Combs' assertion that Plaintiff

---

[13] As discussed herein, the facts must reasonably be viewed in a light most favorable to the non-movant on summary judgment where there is evidence to support those facts.  No finding of fact or recommendation of such a finding is made herein that Watts' version of events is true or false.

[14] Combs asserts these arguments in support of his assertion that he is entitled to qualified immunity; however, they speak directly to Plaintiff's § 1983 claim of excessive force and not to the applicability of qualified immunity.  They are analyzed accordingly.

only resisted in the instant he was tackled by Combs.[15]  There is, however, evidence that Watts did not resist arrest as soon as Combs tackled him.  Viewing Combs' assertion of fact on this point in combination with Watts' deposition testimony, there is a short window of time beginning when Combs made contact with Watts to tackle him from behind, continuing as the two men fell to the ground, and ending once Watts was tackled to the ground, during which Plaintiff was resisting arrest.  As such, even cabining the facts as Combs offers them, a finding of liability in this case will not negate Plaintiff's guilty plea and conviction for resisting arrest.

Plaintiff concedes that he resisted arrest at some point, which removes this case from the prohibition stated in *Heck*.  The factual issues in dispute and to be resolved are: When did Plaintiff resist arrest and when did he stop resisting?  This case presents a circumstance very similar to *Hadley*, *supra*.  In *Hadley*, the Court noted that the parties spent "considerable time debating" at what point the plaintiff resisted arrest, but the debate was unnecessary as it was clear and the Court assumed that he resisted at "some point."  *Id.* at 1331.  Finding that there was a dispute of fact as to whether the plaintiff was resisting arrest when the force claimed to be excessive was used by the arresting officer, his guilty plea for resisting arrest did not implicate *Heck*.

---

[15] Combs argues that Plaintiff continued to resist after being tackled; however, that conflicts with Watts' testimony that he did not resist arrest after being tackled.  Given this dispute of fact, Plaintiff's testimony must control on a motion for summary judgment.

*Id.* That is also the case in this lawsuit.

Moreover, this dispute of fact defeats Combs' argument that Watts' claim of excessive force is foreclosed by collateral estoppel. Where a defendant relies "on a state criminal judgment to bar a federal action, [courts] look to the state's law governing collateral estoppel." *Hadley*, 526 F.3d at 1332. The parties, however, rely exclusively on federal law regarding collateral estoppel. Accordingly, Combs' collateral estoppel argument is underdeveloped and is not considered. *Cf. Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court); *Oliver v. Aetna Life Ins. Co.*, 55 F. Supp. 3d 1370, 1391 (N.D. Ala. 2014) *aff'd*, No. 14-15259, 2015 WL 4153628 (11th Cir. July 10, 2015)(refusing to consider an underdeveloped argument). In keeping with the maxim that "the onus is upon the parties to formulate arguments," Combs' collateral estoppel argument fails. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

That said, generally, the doctrine of collateral estoppel prohibits a party from asserting a position in one proceeding that is inconsistent with a position asserted by

that same party in a prior proceeding.  *See U.S. v. Campa*, 450 F.3d 1121, 1152 (11th Cir. 2006).  For the same reasons that belie Combs' *Heck* argument, collateral estoppel is not applicable to Plaintiff's § 1983 excessive force claim.  Watts asserts in both this proceeding and at the criminal proceeding that he resisted arrest.

Under Alabama law, the following elements must be present for collateral estoppel to apply: "(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions."  *Stewart v. Brinley*, 902 So.2d 1, 10 (Ala. 2004) (quoting *Biles v. Sullivan*, 793 So.2d 708, 712 (Ala. 2000) (quoting, in turn, *Smith v. Union Bank & Trust Co.*, 653 So.2d 933, 934 (Ala. 1995)).  "The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication."  *Stewart*, 902 So.2d at 10 (citing *Adams v. Sanders*, 811 So.2d 542, 545 (Ala. Civ. App. 2001)).  The *Stewart* elements are not met, and Combs has not established that the specific facts of Watts' conviction for resisting arrest were determined in the criminal proceedings such that Watts is barred from asserting a contrary position in this lawsuit.

### D.    State Law Claims

Plaintiff's remaining state law claims are for assault and battery against Officer

Combs.[16]  Combs asserts that he is shielded from suit for the alleged assault and battery by the Alabama State agent immunity doctrine as well as the law enforcement officer's statutory discretionary function immunity.  Section 6-5-338 of the Code of Alabama (1975) has long provided such immunity to peace officers of the State of Alabama. As made clear in *Hollis v. City of Brighton*, 950 So.2d 300, 308-09 (Ala. 2006), the analysis of immunity under this statute blends with the State agent immunity analysis that articulated in *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000) and *Ex parte Butts*, 775 So.2d 173 (Ala. 2000).

In order to claim State agent immunity, a State agent bears the burden of demonstrating that a plaintiff's claims arise from a function that would entitle the State agent to immunity.  *See Ex parte Wood,* 852 So.2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. *See Wood*, 852 So.2d at 709; *Ex parte Davis*, 721 So.2d 685, 689 (Ala. 1998); *Ex parte  City of Tuskegee,* 932

---

[16] In the Complaint, Plaintiff brings state law claims against Combs are for false arrest, negligence, wantonness, assault, and battery.  Plaintiff concedes that Combs is entitled to summary judgment as to state law claims sounding in negligence.  (Doc. 28 at pp. 18-21). Plaintiff expressly argues against summary judgment as to the claims for assault and battery; however, he does not make any argument with regard to the wantonness and false arrest claims. As Plaintiff does not oppose Combs' motion for summary judgment on those claims, they are deemed abandoned.

So.2d 895, 906 (Ala. 2005) ("Peace officers are not entitled to absolute immunity under § 6-5-338(a); rather, immunity from tort liability under § 6-5-338(a) is withheld if an officer acts with willful or malicious intent or in bad faith.").  "A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala. 2003) (internal marks and citation omitted).

There is no debate that Officer Combs was acting with state authority and exercising discretionary authority when he arrested Watts.  That fact, however, does not dispose of the claim that, after the arrest was completed, Officer Combs maliciously beat and kicked Watts without justification.  Combs' arguments founded on his conclusion that he did not exert excessive force are not persuasive.

The statutory immunity does not extend to the circumstance where an officer was not acting in compliance with the law. The discretionary-function immunity excludes from its application the circumstance where the peace officer acts willfully, intentionally, maliciously, in bad faith or beyond his or her authority. *Hollis*, *supra*. Here, there is a genuine dispute of material fact as to whether Officer Combs violated Watts' constitutional rights, a decision which ultimately will turn on the core inquiry of whether Officer Combs applied force in a good-faith effort or maliciously and

sadistically to cause harm. Accordingly, Officer Combs' motion for summary judgment as to the state law claims for assault and battery is due to be denied.

## V.    ORDER AND RECOMMENDATION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that (1) the motion for summary judgment filed by Defendant Thomas Mangham (Doc. 22) be **GRANTED** as it is unopposed and judgment should be entered as to all Plaintiff's claims against Defendant Mangham; and (2) the motion for summary judgment filed by Defendants the City of Opelika and Joshua Combs (Doc. 24) be **GRANTED IN PART** and **DENIED IN PART**.  Summary judgment is appropriate as to Plaintiff's claims against the City of Opelika.  Plaintiff's § 1983 Fourth Amendment excessive force claim and his state law claims for assault and battery against Joshua Combs should proceed to trial.  Summary disposition is proper as to all other claims against Joshua Combs.

It is **ORDERED** that the motion to strike (Doc. 31) filed by Defendants the City of Opelika and Joshua Combs is **DENIED**.

Also, it is **ORDERED** that the parties shall file any objections to the said Recommendation on or before **September 9, 2015.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered

by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).

**DONE** and **ORDERED** this 26th day of August, 2015.

/s/ Paul W. Greene
United States Magistrate Judge